UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**US THRILLRIDES, LLC and POLERCOASTER, LLC,**

          **Plaintiffs,**

**v.**                                **Case No.  6:22-cv-2338-CEM-DCI**

**INTAMIN AMUSEMENT RIDES INT. CORP. EST.,**

          **Defendant.**

_____/

### ORDER

      THIS CAUSE is before the Court on Plaintiffs' Motion for Partial Summary Judgment (Doc. 71), to which Defendant filed a Response (Doc. 83), and Plaintiffs filed a Reply (Doc. 99). This cause is also before the Court on Defendant's Motion for Summary Judgment (Doc. 73), to which Plaintiffs filed a Response (Doc. 86), and Defendant filed a Reply (Doc. 100).[1] This cause is also before the Court on Defendant's Motion to Exclude the Expert Opinions and Testimony of Nathan Macdonald (Doc. 74), to which Plaintiffs filed a Response (Doc. 84), and Defendant filed a Reply (Doc. 106). For the reasons set forth below, all three motions will be granted in part and denied in part.

---

[1] Plaintiffs filed a Motion to Strike Defendant's Reply (Doc. 101), which will be denied.

# I.    BACKGROUND

Plaintiffs are affiliated companies that design, market, and sell amusement rides. (W. Kitchen Decl., Doc. 42-1, at 1).[2] Plaintiffs do not engineer, manufacture, or install the rides; they contract with other companies to do so. (*Id.*; W. Kitchen Dep., Doc. 73-6, at 15; Suppl. W. Kitchen Decl., Doc. 86-1, at 5). The owner of Plaintiffs is William Kitchen. (Doc. 42-1 at 1). Kitchen designed the concept for a ride called the "Polercoaster," which is "a roller coaster that is supported or suspended from a vertical tower instead of moving along a horizontal track." (*Id.* at 2). Plaintiffs market and sell the Polercoaster ride concept and own certain intellectual property rights related thereto. (*Id.*). Defendant is a foreign company that designs, engineers, and supplies amusement rides. (Slenders Decl., Doc. 73-3, at 2).

In 2015, Plaintiffs were engaged in a project in Orlando, Florida (the "Orlando Project") to create a Polercoaster ride. (Doc. 86-5 at 3; Doc. 73-3 at 4). Plaintiffs began discussions with Defendant about Defendant possibly providing design and construction services for the Orlando Project. (Doc. 86-5 at 3–4; Doc. 73-3 at 4–5). As part of these discussions, Plaintiffs and Defendant entered into a Confidentiality Non-Disclosure Agreement ("CNDA," Doc. 73-3, at 21–23).

---

[2] All pincites are to the electronic filing page number.

Non-party International Amusements Inc. ("IAI")[3] was also involved in the Orlando Project. The relationship between IAI and Plaintiffs was governed by the Master Intellectual Property Agreement ("MIPA"). (Fabri Dep., Doc. 86-2, at 40; MIPA, Doc. 73-4, at 11). As relevant here, IAI was the project manager and "prime contractor" for the Orlando Project. (Doc. 86-2 at 15). In this role, IAI operated in a general contractor-type capacity, hiring others as subcontractors to actually engineer and manufacture the ride. (*Id.* at 12, 15). IAI subcontracted with Defendant to provide engineering and manufacturing services for the Orlando Project. (*Id.* at 16).

During this timeframe, the possibility of also building a Polercoaster in Atlantic City, New Jersey (the "Atlantic City Project") developed. (Doc. 42-1 at 3). Throughout 2015 and 2016, Plaintiffs, Defendant, and other entities, including a construction consultation firm called Celtic Engineering ("Celtic"), continued discussions and meetings regarding the Orlando and Atlantic City Projects. (*Id.* at 2–4; Soriano Dep., Doc. 71-1, at 6–7). However, due to irrelevant circumstances, neither project was completed. (Doc. 73-6 at 17).

Thereafter in September 2017, a company called Emaar Entertainment LLC ("Emaar") reached out to Defendant about a potential project ("Dubai Project"). (Sept. 17, 2017 Email, Doc. 73-3, at 26–27). Emaar was interested in building a

---

[3] It appears that this company is now called International Amusements LLC. (Doc. 73-4 at 1).

roller coaster at the Dubai Hills Estate Mall ("Dubai Hills Mall"). (*Id.* at 27). Emaar

liked the Polercoaster concept, (*id.*), so Defendant put Emaar in touch with Plaintiffs.

(Doc. 73-6 at 40; Slenders Dep., Doc. 71-1, at 297–98). In March 2018, Plaintiff US

Thrillrides LLC ("USTR") and Emaar entered a Letter of Acceptance ("LOA")

agreement regarding the Dubai Project. (M. Kitchen Decl., Doc. 86-5, at 5; LOA,

Doc. 73-6, at 579–82). The LOA encompassed the "preliminary design and

engineering phase" for the Dubai Project. (*Id.* at 579). Pursuant to the LOA, USTR

sent out a formal Request for Proposal ("DHM RFP," Doc. 73-5, at 103–157) to

Defendant and other potential subcontractors. (Doc. 86-5 at 5). While Defendant

initially planned to bid on the RFP, it ultimately decided not to. (Doc. 71-1 at 307–

08, 115–17).

In the meantime, Emaar hired a new CEO, Damien Latham. (Jackson Dep.,

Doc. 73-6, at 223–24, 230). Latham had a relationship with a real estate advisory

firm, Jones Lang LaSalle ("JLL"), which, as relevant here, assists clients with

managing construction projects. (*Id.* at 222–23). JLL was already working on the

construction of the Dubai Hills Mall itself, and Latham approached JLL in March

2018 about managing the roller coaster project as well. (*Id.* 223–24). Immediately

upon being engaged, JLL began a "deep dive" into the Dubai Project, reviewing

USTR's proposal and cost estimates, "coming up with [its own] robust cost model,"

and "[i]nterrogating the delivery strategy." (*Id.* at 246–47). In JLL's opinion, "it soon

became very clear that USTR [was] not able to demonstrate they had the skills, expertise, or capability in order to deliver this project in a 360-design and build turnkey manner." (*Id.* at 247).

JLL had concerns that there were "large-scale omissions" in USTR's cost estimate.[4] (Hamilton Dep., Doc. 104-2, at 32–33). JLL also had "major concerns" about USTR's strategy for maintaining and operating the ride, specifically the lack of a plan for safely evacuating the ride and whether catwalks would be built both for evacuation and maintenance of the ride. (*Id.* at 33–37). Because of this uncertainty, JLL was also concerned that the project would be not able to obtain the required third-party safety approval. (*Id.* at 34–36). After JLL's initial review, including discussions about these issues with USTR, JLL came to the conclusion that there was "no possible way" USTR could deliver the attraction that it had proposed. (*Id.* at 43–46). JLL advised Emaar of all the issues, and on April 24, 2018, Emaar suspended USTR's work on the Dubai Project until it could engage in further review. (Doc. 73-6 at 249–50; Apr. 24, 2018 Email, Doc. 73-1, at 20).

During this timeframe, JLL was developing its own cost model for the ride concept that had been proposed by USTR. (Doc. 104-2 at 64). Part of this process was obtaining budgetary proposals from various vendors. (*Id.* at 80–81). Because

---

[4] The evidence refers to the "BOQ,"—"bill of quantities"—which is the high-level cost estimate prepared for this stage of the project. (Doc. 104-2 at 29).

the ride system proposed by USTR "was a big question mark," it was one of the items JLL needed to examine. One of JLL's project management associates, Mark Hamilton, who had been hired specifically for the Dubai Project due to his extensive experience working on roller coaster and amusement ride projects, (Doc. 104-2 at 12–18), had worked with Defendant previously, (*id.* at 77). Hamilton reached out to Defendant for a budget estimate. (*Id.* at 78–79).

As part of this process, USTR had estimated a $40 million budget; JLL estimated that it would cost at least twice that, and likely closer to $100 million. (*Id.* at 63–64; Hamilton Decl., Doc. 73-2, at 8–9). JLL and Latham viewed this outcome as disastrous, believing that if they attempted to move forward with it, the result would be significant reputational damage for JLL and likely Latham's termination. (Doc. 104-2 at 66–67). As such, JLL was attempting to determine what kind of roller coaster could be built within or close to the $40 million budget, so the estimate JLL requested from Defendant was for a smaller ride than originally discussed with USTR. (Doc. 73-2 at 9, 11; Doc. 73-6 at 358–59; *see also* Doc. 73-3 at 12 (noting that JLL provided the ride specifications for the estimate, including the track height)).

During this exchange, JLL did not tell Defendant that Emaar was considering terminating its relationship with USTR, (Doc. 104-2 at 81; Doc. 73-2 at 11), and Defendant believed that USTR would continue on the project, (Doc. 71-1 at 123–

24, 137). In Defendant's view at the time, getting multiple verification bids was a normal part of business, particularly when building in the Middle East. (*Id.* at 123–24). On April 28, 2018, Defendant sent its cost estimate to JLL. (*Id.* at 126). This cost estimate was created using Defendant's "stock proposal template" "based on the generic ride specifications (e.g., track height and length) and used [Defendant's] standard pricing formulas for the region." (Doc. 73-3 at 12). It did not require any design or engineering. (*Id.*).

Ultimately, after reviewing the information put together by JLL, as well as obtaining another third-party independent analysis, (Doc. 73-6 at 46–47; Doc. 104-2 at 58–59), Emaar terminated its relationship with USTR on May 10, 2018. (Doc. 104-2 at 69; Doc. 73-1 at 7). On May 29, 2018, Emaar and Defendant entered into a Letter of Intent, memorializing their agreement to move forward on developing a smaller roller coaster for the Dubai Hills Mall. (Letter of Intent, Doc. 86-4, at 272–78) It was only after the LOA with USTR had been terminated that Defendant understood Plaintiffs were no longer involved. (Doc. 71-1 at 145). Ultimately, this roller coaster was built and named the Storm Coaster. (Doc. 73-1 at 8).

As a result, Plaintiffs filed suit against Defendant, alleging the following causes of action: breach of contract, alleging a breach of the CNDA (Count I); violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count II); tortious interference with an advantageous business relationship (Count

III), brought by USTR only; breach of contract implied in fact (Count IV); breach of contract implied in law (Count V); misappropriation of trade secrets in violation of Florida's Uniform Trade Secrets Act ("FUTSA") (Count VI), brought by Polercoaster only; and copyright infringement in violation of 17 U.S.C. § 501 (Count VII), brought by Polercoaster only. (*See generally* Compl., Doc. 1-1).

Defendant has now moved for summary judgment on all claims. Plaintiffs have also moved for summary judgment on Defendant's affirmative defenses. Additionally, Defendant has moved to exclude the expert testimony of Plaintiffs' expert Nathan Macdonald.

## II.    MOTION TO EXCLUDE

### A.    Legal Standard

Although opinion testimony is generally inadmissible, Federal Rule of Evidence 702 permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony in limited circumstances. Expert opinion testimony is admissible if: (1) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Pursuant to *Daubert*, the determination of admissibility is "uniquely entrusted to the district court," which is given "considerable leeway in the execution of its duty." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quotation omitted). However, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

The Eleventh Circuit has distilled the test for determining the admissibility of expert testimony under Rule 702 and *Daubert* into three basic inquiries—(1) is the expert qualified; (2) is the expert's methodology reliable; and (3) will the testimony assist the trier of fact. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

## B.    Analysis

Defendant seeks to exclude the following opinions of Plaintiffs' expert, Nathan Macdonald: (1) designs and drawings created for the Storm Coaster are substantially similar to and incorporate major design features of USTR's

copyrighted materials; and (2) the Storm Coaster design is both similar to the Polercoaster designs developed by USTR and embodies and is derived from Confidential Information and Intellectual Property Rights (as defined by the CNDA) conveyed by USTR to Defendant pursuant to the CNDA.

### 1.    *Qualifications*

Macdonald is a registered professional engineer, a certified safety professional, and a certified commercial building inspector. (Macdonald Expert Report, Doc. 74-1, at 8). He has a Bachelor of Science degree in mechanical engineering and eleven years of experience working as a mechanical engineering consultant, including experience working on the design, manufacture, and testing of amusement rides. (*Id.*). Defendant makes two challenges to Macdonald's qualifications.

First, Defendant argues that Macdonald is not qualified to opine on any of the issues here because he does not have specific experience with roller coaster design. While Macdonald has not designed a roller coaster, he has "worked on all the components that are involved in a roller coaster, [has] experience evaluating coasters, and [has a] significant amount of experience related to coasters and the engineering and design work that is involved." (Macdonald Decl., Doc. 84-6, at 4). "An expert is not necessarily unqualified simply because [their] experience does not precisely match the matter at hand." *Furmanite Am., Inc. v. T.D. Williamson*, *Inc.*,

506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing *Maiz v. Virani*, 253 F.3d 641,

669 (11th Cir. 2001)). Macdonald's experience and training makes him qualified to

opine on the mechanics, engineering, and technical design aspects of the roller

coasters and drawings at issue here.

Second, Defendant also challenges Macdonald's qualifications to opine as to

analyzing copyright, trade secret, and misuse of confidential information issues. This

issue is more nuanced. Macdonald is qualified to conduct a technical and

engineering comparison between Plaintiffs' designs and drawings with Defendant's

designs, drawings, and the Storm Coaster. Macdonald is also qualified to testify

regarding how confidential information and trade secrets are treated and used within

the industry. (*See* Doc. 84-6 at 8–9). On the other hand, Macdonald is not qualified

to opine as to whether information constitutes a trade secret or is confidential

information as this is a legal analysis, not a technical one. Nor is he qualified to opine

as to whether the copyright "substantial similarity" analysis is satisfied. To be clear,

Macdonald could testify that certain aspects of Defendant's design drawings are

similar to certain aspects of Polercoaster's copyrighted drawings from a technical or

engineering standpoint. And Plaintiffs' attorneys could then use that testimony to

argue that the "substantial similarity" analysis for copyright infringement is

satisfied. But Macdonald is not qualified to opine as to the copyright infringement

analysis itself.

2.    *Methodology*

As to Macdonald's methodology, Defendant first argues that Macdonald's copyright opinions must be excluded because Macdonald did not conduct a copyright protectability analysis and because his opinions regarding substantial similarity invade the province of the jury. These issues were addressed in the qualifications analysis—Macdonald is only permitted to testify as to similarities between Defendant's purportedly infringing drawings and Polercoaster's copyrighted drawings from a technical and engineering standpoint. He is not permitted to testify as to whether these similarities are protectable under copyright law.

Defendant also objects to Macdonald's opinions because they assume that the designs and drawings attributed to Polercoaster actually belong to Polercoaster, and Defendant argues that they do not. This is not an issue with Macdonald's methodology in comparing the designs. Defendant is free to offer evidence at trial that the drawings do not belong to Polercoaster, but an expert is allowed to offer opinions based on assumptions given to them. *Fla. Transp. Serv. v. Mia.-Dade Cnty.*, No. 05-22637-CIV-JORDAN/MCALILEY, 2009 U.S. Dist. LEXIS 151407, at *14 (S.D. Fla. Dec. 29, 2009) (finding admissible an "expert's proffered opinions" that were "formulated, in part, based on information from others" but noting that such

opinions are "subject to attack at trial as based on self-serving or erroneous assumptions").

Next, Defendant argues that Macdonald's opinions comparing Polercoaster's copyrighted works to the as-built Storm Coaster must be excluded because an as-built structure cannot infringe Polercoaster's copyrights. As addressed below in the copyright claims analysis, Polercoaster concedes that Defendant is correct. Additionally, Defendant's remaining objections to Macdonald's opinions are rendered moot because Plaintiffs' trade secrets and non-copyright-based breach of the CNDA claims fail on the merits.

### III.    MOTIONS FOR SUMMARY JUDGMENT

#### A.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir.

2007). In ruling on a motion for summary judgment, the Court construes the facts

and all reasonable inferences therefrom in the light most favorable to the nonmoving

party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, when faced with a "properly supported motion for summary judgment,"

the nonmoving party "must come forward with specific factual evidence, presenting

more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th

Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v.

Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that

suspicion, perception, opinion, and belief cannot be used to defeat a motion for

summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is

a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on

summary judgment is 'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009)

(quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary

judgment should be denied only "[i]f reasonable minds could differ on the inferences

arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d

1264, 1267 (11th Cir. 2016) (quoting *Allen*, 121 F.3d at 646).

## B.    Defendant's Motion for Summary Judgment

As an initial matter, in response to Defendant's Motion for Summary Judgment, Plaintiffs state that they are no longer pursuing their FDUTPA claim. Therefore, Defendant is entitled to summary judgment as to that claim.[5] The Court now turns to the remaining claims.

### 1.    *Tortious Interference*

To prove a claim for tortious interference with a business relationship, USTR "must show four elements: [(1)] the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.*, 987 So. 2d 706, 707 (Fla. 4th DCA 2008) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)). "Imbedded within these elements is the requirement that the plaintiff establish that the defendant's conduct caused or

---

[5] The parties purport to stipulate to the dismissal of Plaintiffs' FDUTPA claim. (Doc. 83 at 16; *see also* Doc. 86 at 31 n.30 (purporting to "withdraw[ ]" the FDUTPA claim)). However, Federal Rule of Civil Procedure 41(a), which governs this type of dismissal, "allows a plaintiff to dismiss all of his claims against a particular defendant; its text does not permit plaintiffs to pick and choose, dismissing only particular claims within an action." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004). "As a result, a Rule 41(a) dismissal of only one of the claims against a defendant or defendants is ineffective and leaves that claim pending in the district court, creating a lack of finality." *Baxter v. Santiago-Miranda*, 121 F.4th 873, 884 (11th Cir. 2024). Therefore, at this stage of the proceedings, the Court finds it more appropriate to consider the claim abandoned and grant Defendant's request for summary judgment. *Id.*

induced the breach that resulted in the plaintiff's damages." *Chi. Title Ins. Co. v. Alday-Donalson Title Co. of Fla.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002). "In considering the element of causation, Florida courts have held that the plaintiff must plead and prove that the defendant manifested a specific intent to interfere with the business relationship. Thus, even if the defendant is aware of the existing business relationship, the defendant will not be liable for tortious interference with that relationship unless there is evidence that the defendant intended to procure a breach of the contract." *Id.* (internal citation omitted) (collecting cases).

USTR claims that Defendant interfered with its relationship with Emaar. However, as the evidence laid out above makes abundantly clear, no one at Emaar or JLL told Defendant that it was considering terminating its relationship with USTR, and Defendant assumed that USTR would continue to be involved when Defendant provided its initial cost estimate. In fact, as noted, Defendant was the one that brought USTR into the project to begin with. Defendant was not aware of the potential termination until after Emaar ended the relationship with USTR. There is simply no evidence that Defendant intended to interfere with USTR's relationship with Emaar.

Moreover, there is direct evidence that Defendant was not the cause of the termination of that relationship. Both JLL representatives, who were intimately involved in the discussions with Emaar that led to the termination, made absolutely

clear that "[t]here was no scenario going forward that would involve USTR"
regardless of Defendant's involvement. (Doc. 73-2 at 12; Doc. 73-1 at 7). USTR was
terminated because, at least in JLL and Emaar's view, "they couldn't demonstrate
the technical ability to deliver. And there were many contractual red flags . . . . If
[Defendant] had not been available to provide pre-engineering services or otherwise
participate in the project," USTR would have still been terminated. (Doc. 104-2 at
109–10). USTR's arguments to the contrary are mere speculation. USTR's tortious
interference claim fails.

### 2.    *Copyright*

Before addressing the substance of Polercoaster's copyright claims, the Court
must address a threshold issue related to who has ownership rights to some of the
copyrighted documents. Specifically, the Court must determine whether the Work
Made for Hire provision of the MIPA is enforceable against Defendant and whether
that issue is precluded under the doctrine of collateral estoppel. The Court will then
address the substantive copyright claims.

### a.    Work Made for Hire and Collateral Estoppel

The MIPA contained a "Work Made for Hire" provision. (Doc. 73-4 at 20).
That provision states, in relevant part:

> Any Services . . . performed under [the MIPA] by [IAI],
> its agents, employees and/or subcontractors, shall be
> considered a "Work Made for Hire" as that phrase is
> defined by the United States Copyright laws and shall be

> owned by and for the express benefit of [Polercoaster]. In the event it should be established that such work does not qualify as a Work Made for Hire, its agents, employees and/or subcontractors, agree to and do hereby assign to [Polercoaster] all of their right, title and interest in such work product including, but not limited to. all copyrights, patents, trademarks and other proprietary rights.

(*Id.*).

Polercoaster argues that this provision binds Defendant as a subcontractor, so any documents drafted pursuant to the MIPA belong to Polercoaster. However, Defendant was not a party to the MIPA. Indeed, there was separate litigation between Plaintiffs and Defendant regarding Defendant's relationship to the MIPA. *Intamin Amusements Rides Inc. Corp. Est v. US Thrillrides, LLC*, Case No. 6:20-cv-713-CEM-DCI ("Arbitration Case"). In that litigation, Plaintiffs[6] argued that Defendant was bound by the MIPA's mandatory arbitration provision, and the Court determined that Defendant was not. Specifically, in the Arbitration Case, the parties recognized that Defendant was not a signatory to the MIPA, but several arguments were advanced regarding whether Defendant was nonetheless bound by the MIPA. *Arbitration Case*, 2022 WL 17416565, at *4–7 (M.D. Fla. Apr. 26, 2022). The Court analyzed and rejected each of these theories, determining that Defendant was not a party to nor bound by the MIPA. *Id.* Defendant argues that Plaintiffs are collaterally

---

[6] Because the Arbitration Case was a declaratory judgment action, seeking a ruling that arbitration could not be compelled, the parties were reversed in the Arbitration Case—i.e., Defendant was the plaintiff and Plaintiffs were the defendants. (Arbitration Case, Compl., Doc. 1).

estopped from relitigating the issue of whether Defendant is a party to or bound by the terms of the MIPA. Plaintiffs disagree and have moved for partial summary judgment on this issue.

Collateral estoppel, also known as "[i]ssue preclusion[,] . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1272 (11th Cir. 2020) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). "[F]ederal common law borrows the state rule of collateral estoppel to determine the preclusive effect of a federal judgment where the court exercised diversity jurisdiction." *Id.* at 1273 (quoting *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1340 (11th Cir. 2017)).

The Arbitration Case was brought pursuant to the Declaratory Judgment Act, which "'does not, of itself, confer jurisdiction upon the federal courts'; therefore, 'a suit brought under the Act must state some independent source of jurisdiction, such as the existence of diversity or the presentation of a federal question.'" *Id.* (quotation omitted). This Court exercised diversity jurisdiction over the Arbitration Case. (*See generally* Arbitration Case, May 26, 2020 Order to Show Cause, Doc. 26; Arbitration Case, June 3, 2020 Response to Order to Show Cause, Doc. 29; Arbitration Case, June 4, 2020 Order Discharging Order to Show Cause, Doc. 31).

Therefore, the Court must apply Florida's collateral estoppel laws here. *Sellers*, 968

F.3d at 1273; *Arbitration Case*, 2022 WL 17416565, at *3 (applying Florida law to

the interpretation of the MIPA).

      "The 'essential elements' of collateral estoppel in Florida are that 'the parties

and issues be identical, and that the particular matter be fully litigated and

determined in a contest which results in a final decision of a court of competent

jurisdiction.'" *Harris v. Jayo (In re Haris)*, 3 F.4th 1339, 1345 (11th Cir. 2021)

(quoting *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 945 So. 2d 1216,

1235 (Fla. 2006)). Some authorities also state that "the issue must have been a

critical and necessary part of the prior determination." *Crowley Mar. Corp. v. Nat'l

Union Fire Ins. Co.*, 931 F.3d 1112, 1126 (11th Cir. 2019); *Acadia Partners, L.P. v.

Tompkins*, 759 So. 2d 732, 738 (Fla. 5th DCA 2000); *see also In re Haris*, 3 F.4th at

1345–46 & n.3 (recognizing this is a "thorny question of Florida law," indicating

that it may not be required, but ultimately not addressing the issue because it was

unnecessary under the particular facts of the case).

      Plaintiffs do not dispute that the parties were identical and that a final

judgment was rendered by a court of competent jurisdiction after full litigation.

Instead, Plaintiffs assert that the issues in the Arbitration Case were different than

the issues presented here. As noted, in the Arbitration Case, the Court considered

whether the arbitration provision of the MIPA could be enforced against Defendant

as a non-signatory. Here, the question is exactly the same except as to the Work Made for Hire provision rather than the arbitration provision. Plaintiffs argue that this difference matters because "[t]here is a specialized body of law concerning when non-signatories are bound by an arbitration provision." (Doc. 99 at 2). Curiously, Plaintiffs cite no authority for this proposition. This is because Plaintiffs are incorrect.

"[T]raditional principles of state contract law . . . govern the enforceability of arbitration agreements by or against a non-signatory." *Fisher v. PNC Bank, N.A., PNC Invs., LLC*, No. 21-13266, 2022 U.S. App. LEXIS 15591, at *5–6 (11th Cir. June 7, 2022); *Caley v. Gulfstream Aero. Corp.*, 428 F.3d 1359, 1367–68 (11th Cir. 2005) ("The purpose of the [Federal Arbitration Act] is to give arbitration agreements the same force and effect as other contracts. However, state law generally governs whether an enforceable contract or agreement to arbitrate exists."); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.").

There are several arguments that Plaintiffs advance here in an attempt to enforce the Work Made for Hire provision against Defendant: (1) that Defendant was expressly named as a subcontractor in the MIPA, (Doc. 99 at 2); (2) that by

reviewing the MIPA and negotiating portions of it, Defendant agreed to be bound

by it, (*id.* at 2 & n.3)[7]; and (3) that IAI was operating as Defendant's agent, (Doc. 86

at 26 (making a one-sentence argument that the parties' "intent" is relevant to this

issue and citing case law where issues regarding whether a party's agent signed a

work made for hire agreement)). The last two arguments are substantively identical

to those made, and rejected, in the Arbitration Case. 2022 WL 17416565 at *4–7.

The first argument requires a little more explanation.

In the Arbitration Case, the Court expressly addressed the fact that Defendant

was named as a subcontractor in the MIPA and rejected Plaintiffs' argument that this

reference rendered IAI Defendant's agent. *Id.* at *4. The fact that Plaintiffs are now

attempting the enforce the provision where Defendant is referenced as a

subcontractor is of no consequence. In the Arbitration Case, Plaintiffs attempted to

use the current provision to enforce the MIPA against Defendant. The arguments

and analysis are exactly the same.

---

[7] In the body of their argument, Plaintiffs state that Defendant "agreed to be bound by [the work-for-hire provisions] in the MIPA." (Doc. 99 at 2). In footnote 3, Plaintiffs clarify this argument, citing to evidence that Defendant reviewed the MIPA and determined that it was willing and able to provide the goods and services to IAI so that IAI could fulfill its promises to Plaintiffs under the MIPA. (*Id.* at 2 n.3). This is not evidence that Defendant agreed to be bound by the Work Made for Hire provision. Indeed, this argument supports the conclusion that collateral estoppel applies because the Court addressed this precise issue in the Arbitration Case. 2022 WL 17416565, at *4 ("[I]t appears that [Defendant's] executives were in discussions with IAI throughout the negotiations of the contract documents. . . . Even assuming that is true, however, [Plaintiffs] fail to cite any authority for the proposition that one party's involvement in negotiations renders them the principal to the ultimate signatory. Instead, it is perfectly logical for general contractors to communicate with subcontractors throughout the negotiation of agreements to ensure that subcontractors can complete required work on time and under budget.").

Plaintiffs attempt an end run around this analysis by pointing to language in the Work Made for Hire provision, which purports to bind IAI's subcontractors. (Doc. 73-4 at 20 ("Any Services . . . performed under [the MIPA] by [IAI], . . . and/or [its] subcontractors, shall be considered a "Work Made for Hire")). But parties can put anything they want into a contract regarding third parties; there still must be a legal theory to bind those third parties. *See Drucker v. Duvall*, 61 So. 3d 468, 472 (Fla. 4th DCA 2011) ("[O]rdinarily a contract cannot bind one who is not a party thereto or has not in some fashion agreed to accept its terms."). And these legal theories were all exhaustively litigated and rejected in the previous litigation. The fact that Plaintiffs wanted to bind Defendant does not change the legal conclusion that they did not. Plaintiffs are collaterally estopped from relitigating the issue of whether Defendant is bound by the MIPA; it is not.

Because Defendant is not subject to the Work Made for Hire provision, the Court can now turn to the substantive copyright issues—including the issue of whether Polercoaster owns the documents contained in the copyrights at issue.

b.   Copyright Claims

Defendant makes an initial argument that all of Polercoaster's copyright claims fail because the Copyright Act has no extraterritorial effect and all of Defendant's work regarding the Storm Coaster was done outside of the United States. (Doc. 73 at 24 (citing 17 U.S.C. § 501)). Defendant is correct in general

terms, but "to the extent that part of an 'act' of infringement occurs within this country, although such act be completed in a foreign jurisdiction, those who contributed to the act within the United States may be liable under U.S. copyright law." *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004) (quotation omitted).

Polercoaster asserts that Defendant obtained the drawings that it purportedly copied while in Florida, and therefore, sufficient acts of infringement occurred in the United States. Defendant does not adequately address or rebut this argument and therefore has not met its burden for summary judgment on this issue.[8] (*See* Doc. 100 at 4 (summarily asserting that a portion of Polercoaster's argument regarding an infringing act is insufficient but failing to provide any actual analysis)).

Turning to the substantive copyright claims, Polercoaster holds the copyright to four documents: the Skyplex Polercoaster Orlando Proposal ("Orlando Proposal," Doc. 73-5, at 58), the Dubai Hills Mall Request for Proposals ("DHM RFP," Doc. 73-5, at 100), the Dubai Hills Mall Polercoaster Plans ("DHM Plans," Doc. 73-5, at 159), and the Dubai Hills Mall Presentation ("DHM Presentation," Doc. 73-5, at 165). "To establish copyright infringement, a plaintiff must prove: '(1) ownership of

---

[8] Additionally, to the extent Defendant argues that Polercoaster does "not argue that [Defendant] used [the AC Drawing] improperly," (Doc. 100 at 4), Defendant is incorrect. Polercoaster alleges that Defendant copied portions of the AC Drawing in creating the Storm Coaster Drawings.

a valid copyright, and (2) copying of [protectable] elements.'" *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1325 (11th Cir. 2012).

Defendant argues that Polercoaster cannot satisfy the ownership element as to the Orlando Proposal and as to one of the key documents within the DHM Presentation, a drawing created for the Atlantic City Project (the "AC Drawing"). "[T]he Copyright Act provides that [a certificate of registration] 'shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate,'" but it "is not conclusive on the copyright ownership issue." *Progressive Lighting, Inc. v. Lowe's Home Ctrs., Inc.*, 549 F. App'x 913, 918 (11th Cir. 2013) (quoting 17 U.S.C. § 410(c)). "Once a plaintiff produces a certificate of registration, the burden shifts to the defendant to establish that the work in which the copyright is claimed is unprotectable . . . ." *Id.* (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010)).

Defendant asserts that it is the author of the AC Drawing and that it and IAI are the authors of the Orlando Proposal. Defendant further argues that there was no transfer of ownership to Polercoaster, and therefore, Polercoaster is not the owner of those documents and the associated copyrights. "Copyright interests 'vest[ ] initially in the author or authors of the work.'" *Patrick v. Poree*, No. 23-12732, 2023 U.S. App. LEXIS 33078, at *4 (11th Cir. Dec. 14, 2023) (quoting 17 U.S.C. § 201(a)). "An attempt to transfer copyright ownership is only valid if 'an instrument of

conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.'" *Id.* (quoting 17 U.S.C. § 204(a)).

The Orlando Proposal Certificate of Registration lists IAI as the author that created the text and Defendant as the author that created the artwork. (Doc. 73-5 at 58). Polercoaster is then listed as the Copyright Claimant, and the "[t]ransfer statement" is listed as being "[b]y written agreement." (*Id.*). In its Response, Polercoaster does not deny that the listed authorship is correct. Instead, it argues that IAI and Defendant transferred their ownership interests to the Orlando Proposal via the Work Made for Hire provision of the MIPA. As discussed above, Defendant is not subject to the Work Made for Hire provision, and there is no other evidence that Defendant ever transferred its interests in the Orlando Proposal drawings. Thus, Polercoaster cannot establish the first element of copyright infringement as to any of the drawings contained in the Orlando Proposal.[9] Therefore, to the extent Polercoaster's copyright claim is based on the drawings contained in the Orlando Proposal, Defendant is entitled to summary judgment thereon.

Moving on to the AC Drawing, Defendant offers evidence that it "prepared in-house" the AC drawing for marketing purposes. (Doc. 73-3 at 9). Polercoaster

---

[9] While IAI was a signatory to the MIPA and is bound by the Work Made for Hire provision, it does not appear that Polercoaster is basing its copyright claims on any text of the Orlando Proposal.

offers directly contradictory evidence that the AC Drawing was a "copy of [Polercoaster's] prior drawings reproduced on [Defendant's] paperwork." (Doc. 86-1 at 10). The Court cannot resolve these diametrically opposed factual assertions on summary judgment. Thus, an issue of fact remains as to whether Polercoaster can satisfy element one as to the AC Drawing.[10]

The Court now turns to element two of copyright infringement: copying. "The copying element 'comprises two subparts, factual and legal copying.'" *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1156 (11th Cir. 2024) (quotation omitted). "The factual copying inquiry is 'whether the defendant, as a factual matter, copied portions of the plaintiff's [work]." *Id.* (quotation omitted). "[L]egal—or actionable—copying occurs when those elements of the copyrighted work that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *Id.*

Defendant first argues that Polercoaster has not shown any factual copying because it has not identified any specific work of Defendant that is allegedly infringing. Defendant indicates that Polercoaster is improperly using the as-built Storm Coaster as its basis for copyright infringement. Polercoaster agrees that it

---

[10] The parties also discuss whether the AC Drawing is derivative of some of Polercoaster's other drawings. But because there is an issue of fact as to who created the original of the AC Drawing, summary judgment cannot be granted in favor of Defendant on this issue even if the Court were to determine that it was not derivative of Plaintiffs' other works.

cannot allege infringement based on the as-built Storm Coaster. (*See* Doc. 73 at 26
(Defendant arguing that Polercoaster did not register any of the subject works as
architectural works and that "they are all pictorial, graphical, or sculptural copyright
registrations"); Doc. 86 at 31 (not disputing this assertion and stating that
Polercoaster's copyright claim "concerns derivative drawings . . . not the structure
[of the Storm Coaster] itself")); *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527
F.3d 1218, 1231 (11th Cir. 2008) (noting that a pictorial, graphic, or sculptural
"copyright cannot be infringed by an as-built structure").

Instead, Polercoaster has identified three of Defendant's documents,
collectively referred to as the "Storm Coaster Drawings," upon which it bases its
copyright claims. Polercoaster refers to these documents individually as "Exhibit
25" (Doc. 86-7 at 2), "Exhibit 28" (Doc. 86-6 at 2–3), and "IAR 2163.DWG" (Doc.
86-8 at 2–5). Thus, to the extent Defendant argues that Polercoaster has not
sufficiently identified the allegedly infringing documents, that argument fails.

Next, Defendant argues that Polercoaster has not shown factual copying as to
the drop ride pictured in Polercoaster's drawings because the Storm Coaster does
not have a drop ride. However, as Defendant itself stated, the comparison here is not
with the as-built Storm Coaster. The question is whether the Storm Coaster
Drawings contain an infringing illustration of a drop ride. Defendant does not
address this issue, so it has not met its burden.

Moving on to legal copying, the Eleventh Circuit has "adopted a three-step test for legal copying: the abstraction-filtration-comparison test. First, a court should 'abstract'—'break down the allegedly infringed [work] into its constituent structural parts.' Second, a court should filter—'sift out all non-protectable material.' Finally, the court should compare the protected material with the copycat." *Id.* at 1156–57.[11]

For the abstraction element, "if the copyright holder presents the court with a list of features that it believes to be protectable (i.e., original and outside of 17 U.S.C. § 102(b)), the court need not abstract further such features." *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1555 (11th Cir. 1996). Polercoaster asserts that Defendant has copied various aspects of the AC Drawing and the DHM RFP, which it believes to be protectable: (1) the "entire expression" of the ride illustrated therein; (2) the starting position of the ride; (3) the vertical launch; (4)the cylindrical support structure and interconnectedness with the track; (5) the circumferential descent of the track; (6)the loop/twist/turn inversions and the arrangement of those inversions; (7) the footprint and location of the ride; and (8)the style of cylindrical building. (Doc. 86 at 29).

---

[11]Although the abstraction-filtration-comparison test "was initially formulated for computer-software copyright cases, it comports with [the Supreme Court's] directive to view a copyrighted work in its component pieces and strip away unprotectable elements, ultimately comparing only the work's protected elements to the alleged infringing work." *Morford v. Cattelan*, Case No. 21-20039-Civ-Scola, 2022 U.S. Dist. LEXIS 118967, at *7 (S.D. Fla. July 6, 2022) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991), and collecting authorities).

Defendant's arguments focus primarily on the second step, filtration, arguing that most of the allegedly copied elements are not protectable. First, Defendant cites basic case law for the unremarkable concept that ideas themselves are not protected by copyright law, only the specific expression of an idea is protected. *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007) (quoting *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999)); 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Defendant then summarily asserts that all of Polercoaster's allegedly copied elements are "manifestly concepts or ideas, not expressions of those ideas." (Doc. 73 at 27). Defendant offers no further analysis or citation to legal authority. This underdeveloped argument is insufficient to meet Defendant's burden.

Next, Defendant argues many of above elements are unoriginal and therefore not protectable. Defendant specifically references the vertical LSM lift; mounting a track to a circular support structure; and the track having a circular pattern with twists, turns, and horizontal loop inversions. In response, Polercoaster does not offer any argument that each of these component elements are original.[12]

---

[12] Polercoaster does maintain that its specific loop/twist/turn inversion is original. Defendant does not specifically address this element and therefore is not entitled to summary judgment as to it. However, as to the other elements—the LSM vertical lift, mounting a track to a

Instead, Polercoaster argues that it is the arrangement of those components that creates an original, protectable expression. *See Corwin*, 475 F.3d at 1251 ("[A] work may be protected by copyright law when its otherwise unprotectable elements are arranged in a unique way."). In its Reply, Defendant addresses this argument in half of a sentence without any legal support, merely stating that Polercoaster has not shown that the placement of each element is protectable. (Doc. 100 at 2).[13] But, at this stage, it is Defendant's burden to show that it is entitled to summary judgment, and such a conclusory, unsupported argument does not meet that burden. Similarly, Defendant raises for the first time in its Reply that the starting point of the ride depicted in Polercoaster's drawings is not protectable. But "reply briefs are not a vehicle to present new arguments or theories." *WBY, Inc. v. Dekalb Cnty.*, 695 F. App'x 486, 492 (11th Cir. 2017). As such, and because Polercoaster was not given the opportunity to address this argument, the Court declines to address it as well.

---

circular support structure, and the track having a circular pattern with twists, turns, and horizontal loop inversions generally—given Polercoaster's Response, it is limited to claiming that the specific arrangement of those elements is protectable, not each individual element. 17 U.S.C. § 103(b) ("The copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."); *Off Lease Only, Inc. v. Lakeland Motors, LLC*, 825 F. App'x 722, 726 (11th Cir. 2020) ("[Compilation] works have only a 'thin' copyright protection, extending only to selection, coordination, or arrangement of elements.").

[13] Defendant also makes an argument that the arrangement in Polercoaster's drawings is not the same as the arrangement of Defendant's drawings. That argument is addressed below in the comparison analysis.

Thus, Defendant has not met its burden to show Polercoaster's asserted copyrights
are unoriginal.

Defendant also summarily asserts that Polercoaster's referenced copyrights
are utilitarian and therefore not protected. Defendant does not discuss the
requirements for something to be utilitarian or a "useful article," as that term is
statutorily defined. Nor does Defendant undertake a severability analysis. *Baby
Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1316 (11th Cir. 2010) ("[A] useful
article, as a whole, does not receive copyright protection, but any constituent design
elements that can be physically or conceptually separated from the underlying article
can receive copyright protection."). Thus, Defendant has not met its burden as to this
argument.

Defendant also mentions that features subject to the *scenes a faire*[14] and
merger doctrines are not protectable. While the Court agrees with this standard
concept of copyright law in general, Defendant's broad-strokes argument that the
merger doctrine applies to invalidate all of the alleged protectable elements—
without discussion of the individual elements themselves—is insufficient to meet
Defendant's burden. However, Defendant does mention one element in particular,

---

[14] "[C]opyright does not cover *scenes a faire*, which are '[i]ncidents, characters, or settings
that are indispensable or standard in the treatment of a given topic.'" *Bennett v. Walt Disney Co.*,
No. 23-12786, 2024 U.S. App. LEXIS 22430, at *4 (11th Cir. Sep. 4, 2024) (quoting *Herzog v.
Castle Rock Ent.*, 193 F.3d 1241, 1248 (11th Cir. 1999)). For example, military outfits and
grappling guns are *scenes a faire* in the action and comic book genres. *Id.* at *5.

the location of the Storm Coaster, that is clearly not protectable under the merger doctrine.

"The merger doctrine provides that 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007). Here, it is undisputed that there were only five possible locations for the Storm Coaster due to the design and construction of the Dubai Hills Mall itself. (*See* Doc. 74-1 at 30). And those options were narrowed down to one location by the developers of the Mall. (*See* Jackson Decl., Doc. 73-1, at 9 (noting that Emaar decided where the Storm Coaster was to be located)). Thus, if the location of the ride were to be protectable, that would prohibit the creation of any plans for any ride at the Dubai Hills Mall. In other words, "[w]ith so few options," allowing Polercoaster to copyright the location of the ride "would merge the expression" (the location of the ride) "with the idea" (creating a ride at the Dubai Hills Mall), which is contrary to copyright law and prohibited under the merger doctrine. *Compulife Software*, 111 F.4th at 1159. Thus, the location of the ride is not protectable.

Additionally, to the extent Defendant argues that Polercoaster's claim fails because it did not engage in an "expressive element analysis," Defendant seems to be arguing that Polercoaster has the duty to rebut an argument that Defendant did

not make, which is not the case on summary judgment. Also, as noted above,

Polercoaster's copyright registration provides a presumption of validity, and

Defendant has the burden of rebutting that presumption.

Finally, Defendant makes arguments within the comparison analysis. Where,

as here, there is not direct evidence of factual copying, "[a] plaintiff may show

copying indirectly by demonstrating that the defendants had access to the

copyrighted work and that the protectable elements of the works are 'substantially

similar.'" *Bennett v. Walt Disney Co.*, No. 23-12786, 2024 U.S. App. LEXIS 22430,

at *3–4 (11th Cir. Sep. 4, 2024) (quoting *Miller's Ale House*, 702 F.3d at 1325).

Substantial similarity is "from the point of view of the lay [observer]." *Miller's Ale*

*House*, 702 F.3d at 1325. Defendant argues that when you compare the elements

Polercoaster asserts were infringed with the elements of the Storm Coaster

Drawings, they are not substantially similar. However, as with most of its arguments

relating to copyright infringement, Defendant simply makes this summary argument

without any actual analysis or specific legal citation. This is simply insufficient to

meet Defendant's burden on summary judgment.

Further, in Defendant's Reply, it argues that even if Polercoaster's

arrangement of otherwise unoriginal elements is protectable, Polercoaster has failed

to show that the arrangement of those elements in its drawings are identical to the

arrangement of the elements in Defendant's drawings. But "identical" is not the

correct standard; the correct standard is "substantially similar." *BUC Int'l Corp.*, 489
F.3d at 1149 (explaining that the "'[v]irtual identicality'" standard "applies to
'claims of compilation copyright infringement of nonliteral elements of a computer
program'" but that the "substantially similar" standard applies to other types of
compilations). Defendant has not addressed whether the arrangement of the non-
original elements in Polercoaster's copyright protected works is substantially similar
to the arrangement of elements in the Storm Coaster drawings. Therefore, Defendant
has not met its burden on this issue.

Accordingly, Defendant is entitled to summary judgment under Federal Rule
of Civil Procedure 56(g)[15] that the location of the ride in Polercoaster's drawings is
not protectable and that the vertical LSM lift; the mounting of the track to a circular
support structure; and the track having a circular pattern with twists, turns, and
horizontal loop inversions generally[16] are each on their own unprotectable elements.
The Court makes no ruling as to whether the specific arrangement of those items is
protectable as a compilation.

---

[15] Rule 56(g) states: "If the court does not grant all the relief requested by the [summary
judgment] motion, it may enter an order stating any material fact—including an item of damages
or other relief—that is not genuinely in dispute and treating the fact as established in the case.

[16] This does not apply to Plaintiffs' argument that its specific loop/twist/turn inversion is
original. That issue was not briefed, so the Court makes no ruling on it.

### 3.    *Trade Secrets*

Next, Defendant has moved for summary judgment on Plaintiffs'
misappropriation of trade secrets claim. "To prove a claim under the [FUTSA], [a
plaintiff] "must demonstrate that (1) it possessed a trade secret and (2) the secret was
misappropriated." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310–11
(11th Cir. 2020) (quotation omitted). "Florida law defines a trade secret as
information . . . that: (a) [d]erives independent economic value . . . from not being
generally known to, and not being readily ascertainable by proper means by, other
persons who can obtain economic value from its disclosure or use; and (b) [i]s the
subject of efforts that are reasonable under the circumstances to maintain its
secrecy." *Id.* (quoting Fla. Stat. § 688.002(4)).

First, Defendant argues that Plaintiffs have failed to sufficiently identify the
purported trade secrets they allege were misappropriated. But Defendant then
references the answers to interrogatories where Plaintiffs identified what they were
claiming were trade secrets. Those categories are as follows: (1) the design and
engineering plans for the Orlando Project created by Defendant and Celtic; (2) the
technical specifications for the Orlando project set forth in Exhibit A of the Orlando
Project CDEMP[17]; (3) the design and engineering plans for the Atlantic City Project

---

[17] The CDEMP is the Contract for Design, Engineering, Material Procurement between the
developer of the Orlando Project, Skyplex Ownership Group LLC, and IAI. (Doc. 73-6 at 750).

created by Defendant and Celtic; (4) the technical specifications for the Atlantic City

Project set forth in the Atlantic City Project Contract Documents; (5) the

"confidential design, engineering, and technical information" provided to Defendant

in connection with the Orlando and Atlantic City Projects, listing five specific

documents; (6) the "confidential contractual terms of the Orlando and Atlantic City

Projects"; (7) the financial aspects of the Orlando and Atlantic City Projects,

including the costs and projected revenue of those projects; (8) the "terms of the

rights licensed by Plaintiffs to SkyPlex related to the Orlando and Atlantic City

Projects"; (9) the non-public information about the Dubai Project contained in the

RFP; (10) the architectural plans created by RM+ Design & Development, LLC for

the Dubai Project buildings and surrounding elements; (11) the details of the

proposed Dubai Project complex; (12) the costs, projected costs, and projected

revenue for the Dubai Project; (13) the confidential information contained in the

LOA.

  As an initial matter, Defendant argued that it did not receive some of these

purported trade secrets—categories 6–8 and 11–13—and Plaintiffs do not dispute

this assertion. (*See* Doc. 86 at 24). Therefore, Defendant is entitled to summary

judgment as to those categories. Additionally, some of these alleged trade secrets are

based on Defendant's information and documents that Defendant created for the

Orlando and Atlantic City Projects. Plaintiffs appear to be basing those claims on its

argument that Plaintiffs own those documents under the Work Made for Hire provision of the MIPA. As discussed at length above, the MIPA—including the Work Made for Hire provision—does not apply to Defendant. Therefore, to the extent Plaintiffs' trade secret claims are based on that theory, they fail.

Next, as to category 9—"the non-public information about the Dubai Project contained in the RFP"—Defendant argues that this information does not qualify as a trade secret because Plaintiffs did not take reasonable steps to maintain its secrecy. Specifically, Defendant points to the fact that Plaintiffs voluntarily provided this information to third parties without any requirement that the information be kept confidential. (*See* Setpoint RFP Email, Doc. 73-5, at 247; Chance Rides RFP Email, Doc. 73-5, at 252 (same)). But the RFP itself states: "This document in its entirety and any attachments thereto are Confidential, Privileged and Proprietary and intended only for the person or entity bidding or working on the USTR Dubai Hills Mall and contains information which is protected from disclosure. Distribution or copying of the information contained herein by anyone other than the intended recipient is prohibited." (Doc. 73-5 at 108). And the RFP requires a non-disclosure agreement be signed and returned with any bid. (*Id.* at 105). Defendant does not address this disclaimer or provide any legal argument as to whether it is sufficient. The Court will not make such arguments for them. Therefore, Defendant has not met its burden here.

Accordingly, the alleged trade secrets that remain for a misappropriation analysis are categories 1 through 5 insofar as they do not involve items created by Defendant and categories 9 through 10. In general terms, categories 1 through 5 relate to the Orlando and Atlantic City Projects, while categories 9 and 10 relate to the Dubai Project.

Defendant provides direct and circumstantial evidence that it did not misappropriate Plaintiffs' trade secrets. Defendant's Vice President avers that Defendant did not use any of Plaintiffs' trade secrets, explaining that the "Storm Coaster is fundamentally different from [the Orlando and Atlantic City Projects, as well as Plaintiffs' proposed Dubai Project] because [the Storm Coaster] relies solely on an outer structure for support. In addition, the Storm Coaster has different specifications, including a shorter in height and track length and wider in diameter than the [Orlando and Atlantic City Projects] or what Plaintiffs proposed for Dubai." (Doc. 73-3 at 15–16). Defendant also provides evidence that it would be impossible to use any technical information contained in the referenced documents because each ride is unique and the significant differences in design mean significant differences in Defendant's engineering. (*Id.*).

In fact, Guillermo Soriano, the Vice President of Celtic, testified that the technical work and calculations Celtic did for the Orlando Project would be different even from that of the Atlantic City Project, despite those rides being substantially

similar, because the environments are different and the ride is not the exact same experience. (Doc. 73-5 at 275–78). Further, Soriano testified that while the general conceptual design of a tower rollercoaster could certainly be used in many different projects, all of the technical design and engineering must be custom-tailored to each project and environment. (*Id.*).

Plaintiffs attempt to discredit this evidence by citing a single sentence taken out of context. Specifically, after detailing how the engineering was different between the Orlando and the Dubai Projects, Defense counsel asked Soriano if the Dubai Project "required a different take on the engineering or different engineering than [Celtic] did in Orlando?" (Doc. 73-5 at 283). In response to this imprecise question, Soriano responded with an equally imprecise answer, stating "[s]ame process, but different, yes." (*Id.*). When taken in context, however, Soriano had just finished explaining how the engineering was unique for each ride, but the process by which they go through to determine what engineering is needed for each ride is generally the same. (*Id.* at 275–83). So, clearly, Soriano was not saying that the rides or engineering was the same but, instead, that they go through the process of looking at the unique aspects of each ride and tailor the engineering to those aspects.

Plaintiffs also claim that Defendant had never worked on anything like the Polercoaster before the Orlando and Atlantic City Projects, but Plaintiffs misrepresent the evidence. In his deposition, Defendant's Vice President stated that

he *did not know* if Defendant had worked on this type of roller coaster before because he did not "know all the concepts that [his] engineering colleagues [were] working on." (Doc. 71-1 at 291). He went on to explain that he would have to look into Defendant's files to find out that information. (*See id.*). Additionally, Plaintiffs make much of the fact that Defendant was able to put together its bid for the Dubai Project in two weeks, arguing that Defendant must have used Plaintiffs' trade secrets to do that so quickly. But, as detailed in the background section, Defendant provides evidence of exactly how it put together its bid using standard computer software and pricing. Plaintiffs' argument in this vein is pure speculation.

In sum, Defendant presented direct evidence that nothing substantive in the technical documents provided by Plaintiffs to Defendant could be used from one project to the next—all of the calculations and considerations are unique. And Plaintiffs have not otherwise provided evidence of misappropriation. Accordingly, all that is left in the above-referenced categories of purportedly misappropriated trade secrets is the overall concept and general, non-technical design. But these elements do not constitute trade secrets because they were published to the general public in news articles. (Kitchen Dep. Ex. 35, Doc. 73-6, at 733–41; Kitchen Dep. Ex. 36, Doc. 73-6, at 742–45). Therefore, Plaintiffs have failed to show any misappropriation of any actual trade secrets, and Defendant is entitled to summary judgment on this claim.

### 4.    *Breach of CNDA*

To establish their claim for breach of contract, Plaintiffs must prove: "(1) a valid contract; (2) a material breach; and (3) damages." *Liberty Mut. Ins. Co. v. Wolfson*, 299 So. 3d 28, 32 (Fla. 4th DCA 2020) (quotation omitted).[18] For summary judgment purposes, the parties only dispute whether there was a breach of the CNDA.

The CNDA prohibits Defendant from, among other things: "us[ing] any of [Plaintiffs'] Confidential Information or Intellectual Property Rights, or any know-how derived from [Plaintiffs'] Confidential Information or Intellectual Property Rights, to create or develop, or to enable, cause others to create or develop, any products or services the same as or similar to products or services developed by us and embodying our Confidential Information and/or Intellectual Property Rights." (Doc. 73-3 at 22). Plaintiffs' assertions fall into two categories—information that purportedly falls within the definition of Confidential Information and information that falls within the definition of Intellectual Property Rights. The Court will begin with Confidential Information.

"Confidential Information" is defined, in relevant part, as: "Trade Secrets, information, knowledge, design specifications, design criteria, inventions,

---

[18] The parties agree that Florida law controls the breach of contract claim.

discoveries, know-how, patents and patent rights,[19] and/or any other information that
we have marked confidential or is known by you to be proprietary, whether or not
patented or patentable and whether or not copyrighted or copyrightable, which
becomes known by you by virtue of this Agreement and/or is communicated by,
from or through our agents or employees." (*Id.* at 21). However, "Confidential
Information" expressly does not include: "(a) information which at the time of
disclosure: is published or otherwise in the public domain, (b) information which
after disclosure becomes part of the public domain unless this disclosure was the
result of breach of this Agreement, (c) information which was known by [Defendant]
prior to its disclosure by [Plaintiffs], (d) information which becomes known by
[Defendant] from a source on a non-confidential basis, and (e) information which is
independently developed by [Defendant] otherwise than pursuant to this
Agreement." (*Id.*).

Defendant argues that Plaintiffs have not, and cannot, point to any
Confidential Information that Defendant used in association with the Dubai Project.
Plaintiffs rely on information provided to Defendant during the development of the
Orlando Project from Celtic. Celtic was engaged by Plaintiffs to design and engineer

---

[19] Although Plaintiffs purport to protect patents and patent rights within the confidential
information provision, that provision expressly excepts any information that is published or part
of the public domain. Necessarily, patent information is published, and Plaintiffs have not pointed
to any other patent rights that it would purportedly have that would not be published. As such, the
asserted patent rights, embodied in Plaintiffs' patents, are properly analyzed under the definition
of Intellectual Property, not Confidential Information.

the tower support structure and coordinate other contractors on the Orlando Project. (Soriano Dep., Doc. 71-1, at 13–14). In the course of doing so, Celtic provided Defendant technical data regarding the Orlando tower structure, including technical drawings and design layouts for the tower, (*id.* at 16); information about the behavior of the tower, e.g., how much the tower would move and respond to things like environmental elements and the momentum of the ride, (*id.* at 16, 18–19); location of items associated with the tower, such as elevators, the lift system, columns, and walls, (*id.* at 16); and information regarding clash detection, i.e., where elements of the ride itself and the support structure may conflict so that those issues could be resolved, (*id.* at 16, 19–20).

While much of this information would likely be considered Confidential Information, Plaintiffs have utterly failed to explain how Defendant could have possibly used this information, or any purported know-how from this information, in the Dubai Project. Essentially, Plaintiffs ask the Court to use common sense and look at the Orlando and Dubai Projects and assume that Defendant *must have* used this information. But common sense dictates the opposite conclusion. As explained, the referenced information related to the tower structure that was designed for the Orlando Project, including many project-specific factors regarding the tower. The Dubai Project did not use the same type of tower support structure, it was indoor, it was substantially shorter, and it was located in an entirely different environment.

Indeed, most of this information appears to be the same information Plaintiffs argued

constituted trade secrets, which Soriano testified could not be used from project to

project. For the same reasons Plaintiffs failed to show misappropriation, they have

also failed to show improper use under the CNDA.

Next, Plaintiffs argue that the entire invention and concept of a Polercoaster

is included in the definition of Confidential Information, including the idea of having

a coaster track circumferentially mounted around a cylindrical support structure, the

wrapping track design, and the "iconic loop/twist/turn inversions." (Doc. 86 at 15).

As Defendant points out, and as noted in the trade secrets analysis, these concepts

and ideas were all made public by Plaintiffs prior to the initiation of the Dubai

Project. For example, in December 2015, a newspaper article published an

announcement about the Orlando Project, including detailed concept drawings and

information. (Kitchen Dep. Ex. 35, Doc. 73-6, at 733–41). A similar article was

published on April 13, 2017 about the Atlantic City Project. (Kitchen Dep. Ex. 36,

Doc. 73-6, at 742–45). Thus, even if Defendant disclosed such information, it would

have been excepted from the definition of Confidential Information because at the

time Defendant purportedly disclosed any such information, it was published or

otherwise in the public domain. As such, Plaintiffs have failed to offer any evidence

to support their contention that Defendant breached the Confidential Information

provision of the CNDA.

Plaintiffs also assert that Defendant breached the Intellectual Property provision. As explained above, the question under that provision is whether Defendant used Plaintiffs' Intellectual Property Rights or know-how developed from Plaintiffs' Intellectual Property Rights in association with the Dubai Project. "'Intellectual Property Rights' means [Plaintiffs'] intellectual property or proprietary rights, including copyright rights, trademarks, servicemarks, patent rights (including patent applications and disclosures) and Trade Secrets, recognized in any country or jurisdiction in the world." (Doc. 73-3 at 22).

The Court has already addressed Plaintiffs' copyright and trade secrets allegations. Therefore, to the extent Plaintiffs' breach of the CNDA is brought by Polercoaster for violation of its copyrights, Defendant is not entitled to summary judgment. To the extent Plaintiffs' breach of the CNDA is brought for improper use of trade secrets, Defendant is entitled to summary judgment. The only other Intellectual Property Rights Plaintiffs assert that Defendant used in violation of the CNDA are Plaintiffs' patent rights. Specifically, Plaintiffs reference Patent No. 8,490,549 (the "'549 Patent"). Defendant asserts that Plaintiffs' Response to its Motion for Summary Judgment was the first time Plaintiffs raised the theory of patent infringement as a violation of the CNDA.

"[T]he law is well-established that a party cannot raise for the first time a new theory of liability in summary judgment briefing." *Ewing v. Carnival Corp.*, No. 19-

20264-CIV-GOODMAN, 2020 U.S. Dist. LEXIS 118849, at *41 (S.D. Fla. July 7, 2020) (citing *Cacciamani v. Target Corp.*, 622 F. App'x 800, 804–05 (11th Cir. 2015)). Plaintiffs' Complaint does not reference patents generally or the '549 Patent specifically, nor does it mention patent infringement. (*See generally* Doc. 1-1). Instead, the Complaint generally references "intellectual property rights" ("IP Rights"). (*Id.* at 3). The most specific allegation in this regard is that the roller coaster built in the Dubai Project "is a knock-off of the Polercoaster, and is unquestionably derivative of Plaintiffs' IP Rights." (*Id.* at 7). However, the only specific "IP Rights" referenced in the Complaint are Plaintiffs' copyright rights. (*See id.* at 6, 13). Additionally, while the copyright Certificates of Registration are attached to the Complaint, the '549 Patent is not. (*See* Ex. B to Compl., Doc. 1-1, at 19–24).

Further, in response to Defendant's interrogatory asking Plaintiffs to "[s]tate all facts supporting [Plaintiffs'] contention that [Defendant] misappropriated [Plaintiffs'] 'Intellectual Property' (as that term is used in the CNDA)," Plaintiffs did not reference the '549 Patent specifically or patent infringement generally in any way. (Doc. 73-5 at 35–36 (answering this interrogatory by referencing the answers to interrogatories 3, 4, 5, and 10), *id.* at 15–16 (answering interrogatory number 3, referencing documents provided to Emaar but not mentioning any patents or patent infringement), *id.* at 17–18 (answering interrogatory number 4, referencing "Intellectual Property Rights" generally, but not mentioning any patents or patent

infringement), *id.* at 19–20 (answering interrogatory number 5, asserting that Defendant used Plaintiffs' design proposal as their own and used "information and knowhow" it acquired from Plaintiffs, but not mentioning any patents or patent infringement), *id.* at 28–29 (answering interrogatory number 10, alleging Defendant's use of trade secrets, but not mentioning any patents or patent infringement)). And when asked about whether he was alleging that Defendant infringed any of Plaintiffs' patents, Kitchen stated "[t]hat's not part of the lawsuit." (Kitchen Dep., Doc. 73-6, at 35).

"A response to a summary judgment motion cannot create a new claim or theory of liability." *O'Neal v. City of Hiram*, No. 23-11556, 2024 U.S. App. LEXIS 10021, at *1–2 (11th Cir. Apr. 25, 2024) (citing *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013), and *Monaghan v. Worldpay U.S.*, Inc., 955 F.3d 855, 859 (11th Cir. 2020)). "Instead, at the summary judgment stage, the proper proceeding for amending a complaint is set forth in Federal Rule of Civil Procedure 15(a)." *Id.* (citing *Miccosukee Tribe*, 716 F.3d at 559). Plaintiffs have not moved to amend their Complaint nor did they did not seek leave to file a Sur-Reply to address this issue. *See Cacciamani*, 622 F. App'x at 805 (finding it significant that the plaintiff did not seek leave to file a sur-reply to address a similar

argument). Therefore, Plaintiffs cannot preclude the entry of summary judgment based on a theory that was never alleged.[20]

Accordingly, Defendant is entitled to summary judgment as to breach of the CNDA except insofar as the breach is alleged by Polercoaster to be based on copyright infringement.

### 5. Breach of Contract Implied in Fact

"'A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words.'" *Rhythm & Hues, LLC v. Nature's Lawn Care, Inc.*, 368 So. 3d 12, 15 (Fla. 4th DCA 2023) (quoting *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997)). Therefore, a "contract implied in fact requires the same elements as an express contract," *E A Tapping Servs., LLC v. CDM Constructors Inc.*, No. 6:19-cv-1190-CEM-LRH, 2021 U.S. Dist. LEXIS 96606, at *18 (M.D. Fla. Feb. 23, 2021) (quoting *Jenks v. Bynum Transp., Inc.*, 104 So. 3d 1217, 1224 (Fla. 1st DCA 2012)), namely "a valid contract, material breach, and damages," *Vangaurd Plastic Surgery, PLLC v. UnitedHeatlhcare Ins. Co.*, No. 21-62403-CIV-DIMITROULEAS, 2022 U.S.

---

[20] It is also worth noting that amendment at this late stage of the litigation, after the close of discovery and dispositive motions, would certainly be prejudicial to Defendant—particularly to add a claim involving patent infringement, which requires extensive litigation, including claim construction.

Dist. LEXIS 23253, at *5 (S.D. Fla. Feb. 8, 2022) (citing *Resnick v. AvMed, Inc.*,
693 F.3d 1317, 1325 (11th Cir. 2012), and *Beck v. Lazard Feres & Co., LLC*, 175
F.3d 913, 914 (11th Cir. 1999)). "The only distinction between an express and
implied-in-fact contract is the manner in which the parties' assent is manifested or
proven." *Rhythm & Hues*, 368 So. 3d at 15 (quoting *Baron v. Osman*, 39 So. 3d 449,
451 (Fla. 5th DCA 2010)).

In the Complaint, Plaintiffs allege that their breach of contract implied in fact
claim is brought in the alternative to its breach of the CNDA claim. (Doc. 1-1 at 10).
Plaintiffs then allege that they "provided [Defendant] with various information about
the [Dubai] Project, including drawings for the Polercoaster, in connection with their
preexisting strategic alliance to perform such projects together," and that Defendant
took Plaintiffs' "information about the [Dubai] Project *and failed to pay for it*,"
causing Plaintiffs damages. (*Id.* at 10–11 (emphasis added)).

In the Motion for Summary Judgment, Defendant argues that there is no
evidence to support an implied-in-fact contract requiring Defendant to pay Plaintiffs
for anything. (Doc. 73 at 40). Confusingly, Plaintiffs respond that this argument
"misconstrues Plaintiff[s'] claim" because a promise by Defendant to pay Plaintiffs
"is not the basis of the claim." (Doc. 86 at 20 n.24). However, this is precisely the
basis of the claim alleged in the Complaint. And, as Plaintiffs appear to implicitly
agree, there is no evidence to support such a claim.

Instead, now Plaintiffs seemingly attempt to amend their claim, asserting that there was some sort of implied promise that Defendant "would be the manufacturer for Plaintiff[s] for the Dubai Project, would not build a Polercoaster without Plaintiffs, and would not attempt to do the Dubai Project without Plaintiffs." (Doc. 86 at 19). First, as discussed above with regard to patent rights, Plaintiffs cannot amend their Complaint in a summary judgment response. *O'Neal*, 2024 U.S. App. LEXIS 10021, at *1–2. Second, even if they could bring this claim, it fails.

As to the purported promise that Defendant would not build a Polercoaster without Plaintiffs, even assuming the Storm Coaster is a Polercoaster, the parameters of Defendant working on a Polercoaster—including use of any confidential information or intellectual property—is covered by the CNDA. The Court "will not imply a contract in fact where there is an express agreement addressing the matter at hand." *Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*, 67 F.4th 1312, 1318 (11th Cir. 2023) (collecting cases). Therefore, to the extent Plaintiffs' breach of contract implied in fact claim is premised on Defendant purportedly building a Polercoaster without Plaintiffs, it fails.

As to the purported promise that Defendant would be the manufacturer for Plaintiffs for the Dubai Project, Plaintiffs' own evidence defeats this claim. While Defendant was the one that introduced Plaintiffs to the possibility of participating in the Dubai Project, USTR sought bids from other contractors to manufacture the

project. And USTR did not follow up with Defendant when Defendant failed to provide a bid to USTR by the RFP deadline. But perhaps most illuminating is the fact that USTR was advocating to Emaar and JLL for them not to use Defendant as the manufacturer. There certainly was no "meeting of the minds" that Defendant would be Plaintiffs' manufacturer for the Dubai Project. Finally, as to the purported promise that Defendant would not "do the Dubai Project" without Plaintiffs, there is simply no evidence to support such an implied promise. Indeed, Plaintiffs cite none.

Finally, Plaintiffs rely on *E A Tapping Services, LLC v. CDM Constructors Inc.*, No. 6:19-cv-1190-CEM-LRH, 2021 U.S. Dist. LEXIS 96606, at *18 (M.D. Fla. Feb. 23, 2021). But in *E A Tapping*, the defendant was a general contractor for a project that the plaintiff was bidding on, where there was evidence that the plaintiff was required by the defendant to travel to several meetings and where the defendant knew the plaintiff was purchasing hundreds of thousands of dollars' worth of equipment in reliance on the understanding between the parties that the plaintiff would either be awarded the contract or reimbursed for the purchase. *Id.* The facts of *E A Tapping* represent a classic situation where a contract may be implied in fact. *Rhythm & Hues*, 368 So. 3d at 15 (explaining that a "typical form of contract implied in fact is 'where a person performs services at another's request, or where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances fairly raising the presumption that the parties

understood and intended that compensation was to be paid'"). None of the facts

asserted in *E A Tapping* are present here. While Plaintiffs did attend meetings and

do work for the Dubai Project, that was pursuant to the LOA and at Emaar's

request—there is no evidence that Defendant was in any way involved in these

matters. Moreover, under the LOA, Plaintiffs were paid for that work. Defendant is

entitled to the entry of summary judgment as to Plaintiffs' breach of contract implied

in fact claim.

### 6.    *Breach of Contract Implied in Law*

"The elements of a cause of action for a contract implied in law are that

'(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has

knowledge of the benefit; (3) the defendant has accepted or retained the benefit

conferred[;] and (4) the circumstances are such that it would be inequitable for the

defendant to retain the benefit without paying fair value." *Glob. Network Mgmt., Ltd.*

*v. CenturyLink Latin Am. Sols., Ltd. Liab. Co.*, 67 F.4th 1312, 1316–17 (11th Cir.

2023) (quoting *Com. P'ship*, 695 So. 2d at 386).

Plaintiffs assert that they provided Defendant two types of information, which

constitute a benefit: (1) information about "the Polercoaster invention"; and

(2) information about the Dubai Project, including the nature of the ride that Emaar

wanted, the location, the "footprint," plans, designs, and more. As to the former,

Plaintiffs cannot bring a quasi-contractual claim based thereon since any information

about the Polercoaster invention was done pursuant to the CNDA. *Glob. Network Mgmt.*, 67 F.4th at 1317 ("When a contract addresses a certain topic, that topic cannot be the subject of a claim for a contract implied in law.").

As to the information related to the Dubai Project, the only information that was provided to Defendant by Plaintiffs was the DHM RFP, but there is no evidence that Defendant obtained any benefit from that information. To the contrary, as laid out in detail in the background section, Emaar and JLL each reached out to Defendant on their own to give Defendant information about the project and the parameters of what they wanted done. Further, there is no evidence to support the contention that Plaintiffs' information somehow conferred a benefit even though Defendant did not use any of it. Unlike the case upon which Plaintiffs rely, *Premier Gaming Trailers, LLC v. Luna Diversified Enterprises*, 304 F. Supp. 3d 1270 (M.D. Fla. 2018), there is absolutely no evidence to support the contention that Plaintiffs' Dubai Project information "was the but-for cause of [Emaar] selecting [Defendant]," *id.* at 1285. Plaintiffs' breach of contract implied in law claim fails.

### C.    Plaintiffs' Motion for Summary Judgment

Plaintiff moves for summary judgment on several of Defendant's affirmative defenses: Defense 1, personal jurisdiction; Defense 3, venue; Defense 4, service of process; Defense 5, res judicata/collateral estoppel; Defense 7, offset/set-off; Defense 8, comparative fault; Defense 9, waiver/release; Defense 10, estoppel;

Defense 11 laches; Defense 12, ratification; Defense 13, unclean hands; Defense 14, statute of frauds; Defense 16, duplicative recovery; Defense 18, indispensable parties; Defense 19, negligent misrepresentation; Defense 21, accord and satisfaction; Defense 22, settlement and release; Defense 24, economic loss doctrine; and Defense 26, avoidable consequences. Defendant has agreed to withdraw Defenses 1, 3, 4, 8–10, 13, 18–19, 21–22, and 26. (Doc. 83 at 6, 16). Additionally, Defendant agrees that Defense 24 is moot in light of Plaintiffs' agreement to no longer pursue its FDUTPA claim.

Further, the Court has already addressed Defense 5, res judicata and collateral estoppel, above and determined that Defendant is entitled to summary judgment on that issue. For the same reasons, Plaintiffs are not entitled to summary judgment thereon. And finally, Defense 14 goes only to Plaintiffs' quasi-contractual claims— breach of contract implied in fact and implied in law—which, as discussed above, Defendant is entitled to summary judgment on, rendering Defense 14 moot. Accordingly, the only remaining issues are Defense 7, set-off; Defense 11, laches; Defense 12, ratification; and Defense 16, duplicative recovery. The Court will address each in turn.

### 1. *Defense 7, Set-Off and Defense 16, Duplicative Recovery*

Defendant alleges that it is entitled to a setoff of the amounts paid by Emaar to Plaintiffs on any damages that may be awarded. In its Answer and Affirmative

Defenses (Doc. 25), Defendant does not cite any legal basis for its setoff defense,
(*id.* at 16). But in their summary judgment briefing, the parties only discuss setoff
under Florida law. Therefore, the Court will follow suit. Moreover, because the only
remaining state law claim is breach of the CNDA, the Court will also only analyze
this issue as to that claim.

"Setoffs in contract claims are governed by section 46.015(2)[ of the Florida
Statutes,] which provides that if a plaintiff has released 'any person in partial
satisfaction of the damages sued for, the court shall [setoff] this amount from the
amount of any judgment to which the plaintiff would be otherwise entitled at the
time of rendering judgment.'" *Close Constr., LLC v. City of Riviera Beach Util.
Special Dist.*, 388 So. 3d 822, 825 (Fla. 4th DCA 2024) (quoting *Addison Constr.
Corp. v. Vecellio*, 240 So. 3d 757, 764 (Fla. 4th DCA 2018)). "A setoff [under this
section] requires that settling and non-settling parties be jointly and severally liable."
*Id.* (citing *Am. Prime Title Servs., LLC v. Wang*, 317 So. 3d 1183, 1186 (Fla. 3d
DCA 2021)). "The settled damages must also be the same damages for which the
setoff is sought; stated differently, a setoff is not proper where the trial damages to
be setoff are separate and distinct from the settled damages." *Id.* (collecting cases).
As Plaintiffs point out, Emaar was not a party to the CNDA, and Defendant has
provided no basis upon which Emaar could be jointly and severally liable for any

damages awarded for breach of the CNDA. Accordingly, Plaintiffs are entitled to summary judgment as to the affirmative defense of setoff.

The parties also discuss the defense of "double recovery" in tandem with the defense of setoff, but while these are related, they are different concepts. First, Plaintiffs do not cite any legal authority in their summary judgment briefing regarding the purported double recovery. So, for that basis alone, Plaintiffs are not entitled to summary judgment. Additionally, to clarify why this issue is different from the setoff issue, Plaintiffs are seeking to recoup, among other things, fees they would have been paid for their work on the Dubai Project. Defendant argues that part of those fees would have included the fees that they were paid by Emaar for the work they did on the project, so Plaintiffs' damages cannot include the fees that they were paid. Although Plaintiffs summarily claim they are not seeking these fees as part of their damages, they also did not include them as a consideration in their damages analysis. The parties dispute the facts of whether they should be considered, but that is an issue for trial, not summary judgment.

### 2.    *Defense 11, Laches*

After ruling on Defendant's Motion for Summary Judgment, the only remaining claims are for copyright infringement and breach of the CNDA. The Complaint does not seek any sort of equitable relief in these claims. (Doc. 1-1 at 8–9, 13–14). As to copyright infringement, Plaintiffs are correct that in this scenario

"the equitable doctrine of laches does not bar copyright claims that are timely within the three-year limitations period." *Nealy v. Warner Chappell Music, Inc.*, 60 F.4th 1325, 1331 (11th Cir. 2023) (citing *Petrella v. MGM*, 572 U.S. 663, 667 (2014)).

For Plaintiffs' breach of contract claim, "[a]s an equitable defense, laches is generally only applied to bar claims at equity. . . . Claims for declaratory judgment and breach of contract that seek money damages—claims to enforce a contract—are most often considered legal claims. *727 Randolph St. v. Comer*, No. 4:17cv80-MW/CAS, 2019 U.S. Dist. LEXIS 238147, at *5 (N.D. Fla. July 10, 2019) (internal citation omitted). And here, because Plaintiffs have stated that they are only seeking legal relief, not equitable relief, (Doc. 99 at 4–5), it appears that laches does not apply. *See Corinthian Invest. v. Reeder*, 555 So. 2d 871, 873 (Fla. 2d DCA 1989). Plaintiffs are entitled to summary judgment on this defense.

### 3.    *Defense 12, Ratification*

In its Response, Defendant narrowed its affirmative defense of ratification as only applying to purported copyrighted works that were created post-LOA, implicitly conceding that Plaintiffs are entitled to summary judgment on this defense beyond that scope. And in its Reply, Plaintiffs similarly concede that Defendant's "argument that there is a factual dispute regarding the narrow issue of the post-LOA materials is well taken." (Doc. 99 at 5). Accordingly, Plaintiffs are entitled to

summary judgment on the defense of ratification except as to the post-LOA
materials.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as
follows:

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. 71) is
   **GRANTED in part** and **DENIED in part**.

   a. The motion is **GRANTED** insofar as it seeks summary judgment
      on Defenses 1 (personal jurisdiction), 3 (venue), 4 (service of
      process), 7 (setoff), 8 (comparative fault), 9 (waiver/release), 10
      (equitable estoppel), 11 (laches), 13 (unclean hands), 14 (statute
      of frauds), 18 (indispensable parties), 19 (negligent
      misrepresentation), 21 (accord and satisfaction), 22 (settlement
      and release), 24 (economic loss doctrine) 26 (avoidable
      consequences), and 12 (ratification) except insofar as it
      addressees post-LOA materials.

   b. The motion is otherwise **DENIED**.

2. Defendant's Motion for Summary (Doc. 73) is **GRANTED in part** and
   **DENIED in part**.

a. The motion is **GRANTED** as to Count I (breach of contract) except insofar as it is based on copyright, Count II (FDUTPA), Count III (tortious interference), Count IV (breach of contract implied in fact), Count V (breach of contract implied in law), and Count VI (FUTSA).

b. The motion is further **GRANTED in part** as to Count VII (copyright) insofar as the location of the ride in Polercoaster's drawings is not protectable and the vertical LSM lift; the mounting of the track to a circular support structure; and the track having a circular pattern with twists, turns, and horizontal loop inversions generally are each on their own unprotectable elements.

c. The motion is otherwise **DENIED**.

3. Defendant's Motion to Exclude the Expert Opinions and Testimony of Nathan Macdonald (Doc. 74) is **GRANTED in part** and **DENIED in part**.

a. Any of Macdonald's opinions regarding whether information constitutes a trade secret or is confidential information, and whether the copyright "substantial similarity" analysis is satisfied are excluded.

    b.  The motion is otherwise **DENIED**.

    4.  Motion to Strike Defendant's Reply (Doc. 101) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on February 19, 2025.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record